# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs June 3, 2014

## COURTNEY WATKINS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
No. 08-05482     Honorable J. Robert Carter, Jr., Judge

---

**No. W2013-02046-CCA-R3-PC  - Filed August 27, 2014**

---

The Petitioner, Courtney Watkins, appeals from the denial of post-conviction relief by the Criminal Court for Shelby County.  He was convicted of especially aggravated robbery and sentenced to twenty-three years' imprisonment in the Tennessee Department of Correction. On appeal, the Petitioner argues that he received ineffective assistance of counsel and that the post-conviction court erred in denying his motion for continuance.  Upon our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ALAN E. GLENN, J., joined.  JEFFREY S. BIVINS, J., Not Participating.

Joseph A. McClusky, Memphis, Tennessee, for the Petitioner-Appellant, Courtney Watkins.

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith DeVault, Senior Counsel; Amy P. Weirich, District Attorney General; and Josh Corman, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

After a jury trial, the Petitioner was convicted of especially aggravated robbery arising from the shooting and robbery of Kelvin McDonald on February 25, 2008.  He was subsequently sentenced to a term of twenty-three years in confinement.  See State v. Courtney Watkins, No. W2010-01851-CCA-R3-CD, 2011 WL 4529615 (Tenn. Crim. App. Sept. 30, 2011), perm. app. denied (Tenn. Feb. 15, 2012).  In its opinion on direct appeal, this court affirmed his conviction and summarized the evidence at trial as follows:

On the afternoon of February 25, 2008, the victim, Kelvin McDonald, was driving his white Lincoln Town Car to Best Buy. On his way, he encountered the [Petitioner], Courtney Watkins, whom he had met while the two were incarcerated together in the Memphis jail in 2007. The [Petitioner] was seeking a ride to his cousin's residence at the Wingood Apartments, and the victim offered to take him there after he finished a few errands. The victim did not know the [Petitioner] by name, only by his nickname, "Shorty Fat."

During the course of the afternoon, they stopped at a market for some gas, and the victim bought the [Petitioner] some food and drinks. In the [Petitioner]'s presence, the victim paid for his purchases with a $100 bill. They also discussed the [Petitioner]'s need for a steady job. The victim told him that he was working as a truck driver and gave the [Petitioner] information about how to obtain his commercial driver's license. They also stopped at the victim's cousin's house because he had been having car trouble and had requested the victim's assistance. While at the victim's cousin's house, the victim and the [Petitioner] encountered a man named George Gates, who had also been incarcerated with them.

When they arrived at the Wingood Apartments, the [Petitioner] instructed the victim to drive around to the back to his cousin's apartment. The men encountered a group of Hispanic individuals, and the [Petitioner] spoke to them in Spanish. After the [Petitioner] spoke with them, they all left the area. The [Petitioner] returned to the victim's car and told the victim that his cousin was not home. As the victim turned the car around to leave the apartment complex, the [Petitioner] pulled out a gun and said, "Give me your money." The victim initially thought he was joking because he could not imagine the [Petitioner] doing this to him after he had helped him that afternoon. He told the [Petitioner] to put his gun away and stop playing. The [Petitioner] assured him that he was serious, cocked the gun, and twice fired. Fortunately, the gun misfired both times. After that, he hit the victim in the head with the gun. The victim kept driving, trying to get to a place where he could summon help. The [Petitioner] hit him in the head with the gun a second time while the victim struggled to get his wallet out of his pants. The [Petitioner] told him that he was not moving fast enough and shot him in the head. The victim struggled with the [Petitioner] until he saw a man outside at the apartment complex. The victim rolled down his window and yelled out, "Call the police. He's robbing me."

The man the victim called out to was Larrial Gill, the maintenance man for the Wingood Apartments. While Gill was unloading some equipment at the apartment complex on the afternoon of February 28, he heard a man call out from a white Lincoln, "Call the police. I'm being robbed." He could see two African-American men in the front seat but could not identify either. Gill did not respond to the victim's call for help; instead, he went about his business unloading the equipment. After the car was out of sight, he heard two gunshots. Gill again did nothing in response but went into an apartment in which he was working.

The victim's car subsequently struck a dumpster at the apartment complex. The victim struggled to get out of the car, injuring his knee, but the [Petitioner] held on to him. When the [Petitioner] finally got out of the car, he took the victim's leather jacket and the victim's cellular phone car charger. The [Petitioner] then got back into the car, shot the victim again in the head, and left.

Memphis Patrol Officer Lakeisha Ross responded to the scene. When she arrived, the victim was already in the back of an ambulance, but he was alert and very excited. He told Officer Ross what had happened and that a man with whom he had been incarcerated had robbed and shot him. He explained how the [Petitioner] had come to be in his car that afternoon and how he knew him from their time together while incarcerated. The victim was then taken to a hospital, where he spent a week recovering from his wounds.

Several officers processed the crime scene. Officer Sam Blue took photographs of the victim's Lincoln and collected evidence from the car. He took a number of photographs showing blood on the outside of the driver's side of the car and on the pavement below. Memphis Police Officer Stacy Milligan also photographed the victim's car and areas where fluid samples were identified.

On the same day as the robbery and shooting, Memphis Police Officer Myron Fair interviewed the victim at the hospital. Though the victim was mad and upset, he was clear-minded and recounted to Officer Fair the story of how he had given the [Petitioner] a ride and how he knew him from jail. He also told Officer Fair about their afternoon together, running errands and ending up at the Wingood Apartments. He explained how the [Petitioner] had pulled a gun on him, demanding his money, and the struggle over the gun and subsequent shots to his head. The victim described his assailant as being

-3-

approximately five feet, nine inches tall and weighing 210 pounds. Officer Fair photographed the victim's injuries.

After his conversation with the victim, Officer Fair learned that the [Petitioner]'s first name was Courtney and pulled jail records from the floor and pod on which the victim was incarcerated. As a result, Officer Fair located the [Petitioner]'s name and photograph. Officer Fair then compiled a photographic line-up and presented that line-up to the victim approximately one week after the shooting, after he had been discharged from the hospital. The victim identified the [Petitioner] as his assailant.

Shelby County Sheriff's Sergeant Michaele Byers is the record keeper for the Jail Division. She confirmed at trial that the victim, the [Petitioner], and George Gates had all been incarcerated together on the same floor and in the same pod from March 28, 2007, to April 16, 2007, when the [Petitioner] was released.

The defense at trial was that the [Petitioner] was not the assailant. To that end, Vander Moore testified that on February 25, 2008, the [Petitioner] was helping him move from his residence on Fields Road to a new residence on Gilleas Road from about 10:30 or 11:00 a.m. until shortly before 3:00 p.m., when the [Petitioner] left to pick up his mother at her job downtown. Moore explained that he is employed by the City of Memphis at the Whitehaven Golf Club but that he took February 25 and 26 off to move. However, Mary Hilliard, the keeper of records from Memphis Light, Gas, and Water, presented records showing that the utilities were disconnected at Moore's Field Road residence on February 21, 2008, and also connected that same day at his new Gilleas Road residence. Sandra Allen, an employee of the City of Memphis Golf Department, testified that Moore worked for five hours on the date of the robbery and shooting, but that he did not work on either February 20 or 21.

Charlotte Watkins, the [Petitioner]'s mother, testified that her son picked her up from her place of employment at 3:30 p.m. on February 25, 2008, though she had previously told a state's investigator that she did not know where the [Petitioner] was or what he was doing on February 25, 2008.

Id., *1-3. On February 15, 2012, the Tennessee Supreme Court denied the Petitioner's application for permission to appeal.

On October 9, 2012, the Petitioner timely filed a pro se petition alleging various grounds for post-conviction relief, including the ineffective assistance of counsel. He subsequently filed an amended petition with the assistance of counsel on February 13, 2013. The post-conviction hearing occurred on July 2, 2013.[1]

**Post-Conviction Hearing.** Trial counsel testified that he began practicing criminal law in 1970 and that he tried his first jury trial in 1971. He said that he had handled numerous criminal cases in the past four decades and had practiced in the appellate team at the Public Defender's Office since 2010. In the instant case, he represented the Petitioner at trial and on appeal and spent more than 135 hours on the matter. Trial counsel said that he met with the Petitioner twelve times before trial. Apart from court appearances and jail visits, he also conferred with the prosecutor and the investigator from the Public Defender's Office.

Trial counsel stated that the defense strategy was that the Petitioner was not present at the crime scene. Therefore, Vander Moore and the Petitioner's mother testified as alibi witnesses at trial. In addition, the Petitioner had provided the name George Gates as a potential witness. The Petitioner, the victim, and Mr. Gates had been incarcerated together prior to the robbery. Trial counsel stated that he and the investigator questioned Mr. Gates in the library of the District Attorney General's Office and that they recorded the interview. Trial counsel testified that during the interview, "Mr. Gates said basically he didn't know anything about the case, he hadn't seen [the Petitioner] . . . since they had all been in jail together." Trial counsel recalled that Mr. Gates "just didn't know anything about the case" and that after questioning the potential witness, he "saw no benefit in calling [Mr. Gates] as a witness[.]"

Trial counsel acknowledged that the victim testified at trial that he and the Petitioner ran into Mr. Gates while driving around. When asked whether Mr. Gates would have aided the alibi defense, counsel responded:

> Well I don't know. In rethinking it, it may be -- it may have been some benefit because Mr. Gates contradicted the victim and said that they hadn't run into each other and hadn't seen each other. So in retrospect it may have been some benefit. But at the time I talked to Mr. Gates, since he didn't know anything about the case, I didn't see how he could be helpful.

---

[1] We only address the testimony from the hearing relevant to the issues that the Petitioner raised in his appellate brief. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

Trial counsel said that early in the case, he and the Petitioner were reviewing witness statements, and the Petitioner became angry because the statements were not helpful to his case. At that point, the Petitioner asked, "'[W]hy are you trying to railroad me[?]'" Trial counsel testified that he lost his temper and responded, "[B]ecause I don't like you." After that, they calmed down and trial counsel apologized for his statement. He was embarrassed and sorry for what he said, but he thought that they "got along pretty well" after that incident. Trial counsel did not believe that his ability to represent the Petitioner was subsequently hampered in any way. He stated that the Petitioner even thanked him after the trial and prior to the verdict.

On cross-examination, trial counsel testified that the prosecutor had initially planned to call Mr. Gates as a witness for the State but Mr. Gates subsequently recanted his testimony. The prosecutor then asked trial counsel if he wanted to interview Mr. Gates. After questioning Mr. Gates, trial counsel made the strategic decision not to call this witness for the defense. He recalled that Thomas Shouse, a criminal investigator with the District Attorney General's Office, had testified at trial regarding the difficulty in locating Mr. Gates prior to trial.

The Petitioner testified that trial counsel had been his public defender and had handled his case at trial and on appeal. He said that he met with trial counsel once or twice before trial. He stated that they had discussed alibi witnesses but that they did not have a trial strategy. According to the Petitioner, trial counsel told him that there was a warrant issued for Mr. Gate's arrest. He said that while he was incarcerated with Mr. Gates and the victim, he would speak to Mr. Gates but that he "really didn't know" the victim. After his release, he saw Mr. Gates at one point in his neighborhood but he never saw the victim again. He said that he and his family had tried to contact Mr. Gates to clear up the case.

The Petitioner did not recall that trial counsel reviewed any discovery with him. He stated that he confronted trial counsel about being railroaded because trial counsel only showed him the affidavit of complaint. He said that he did not see any photographs until the trial. The Petitioner stated that he tried to have trial counsel removed from the case after counsel said, "Because I don't like you," but that the trial court told him it was "not a good enough reason." The Petitioner subsequently "prayed about it" and "just left it alone." He said that he was not satisfied with trial counsel's representation because counsel was not filing any motions on his behalf, though he was unable to identify any specific motions. He stated that he had never been in "trouble like this." At trial, he had planned on telling the truth and denying any involvement in the robbery.

The Petitioner said that he was dissatisfied because trial counsel did not adequately investigate his case. He believed that Mr. Gates was a critical witness and that Mr. Gates

"was the root of this problem[.]" He felt that Mr. Gates had provided the victim with his name as the perpetrator. According to the Petitioner, Mr. Gates would have clarified that he never saw the Petitioner and the victim together.

On cross-examination, the Petitioner acknowledged that his defense at trial was that he was not present during the robbery and that Vander Moore testified as an alibi witness. He conceded that he had a prior conviction for aggravated assault with a deadly weapon in Texas, but stated that the situation in the instant case was different.

Upon questioning by the post-conviction court, the Petitioner agreed that he had attempted to call Mr. Gates as a witness at trial and that he did not know where Mr. Gates lived at the time. He stated that trial counsel should have obtained Mr. Gates's address because Mr. Gates "should have an address in the system, something like that." He conceded that post-conviction counsel had attempted to locate Mr. Gates without success and that no one could find Mr. Gates. He had hoped that the victim would testify at trial that he was not the perpetrator. The Petitioner acknowledged that the victim had identified his photograph in a line-up, but he stated that "they just got the wrong person."

After the close of all proof, the court questioned post-conviction counsel regarding Mr. Gates' proposed testimony. Post-conviction counsel responded that the witness would have refuted the victim's claim that he had seen the victim and the Petitioner together on the day of the robbery. The post-conviction court stated that, "That's not an alibi. I mean, the fact that he didn't see something does not equate to it didn't happen." Post-conviction counsel acknowledged that trial counsel had a recorded statement from Mr. Gates stating that Mr. Gates did not see the victim or the Petitioner on the day in question. However, post-conviction counsel argued that trial counsel should have called Mr. Gates to refute the victim's testimony.

At the conclusion of the hearing, the post-conviction court took the matter under advisement and set the date of the written ruling for July 26, 2013. Regarding the proposed testimony of Mr. Gates, the court stated:

> . . . I think we've heard all the proof we're going to hear, barring some change in circumstances and, you know, I don't know what those will be. I don't ever want to foreclose it. If Mr. Gates shows up here tomorrow, I will certainly take his testimony. I mean, I'm not going to say no, we're not going to hear it because he wasn't here on the day of. But that's all I have. . . . If in the interim something comes up and a situation changes that I need to hear any further proof from anyone, let me know.

The State then noted for the record that the evidentiary hearing had originally been set for May 16, 2013, and then reset for June 27th, for the purpose of locating Mr. Gates. On July 26, 2013, the post-conviction court entered a written order denying relief. It is from this order that the Petitioner now timely appeals.

## ANALYSIS

**I. Ineffective Assistance of Counsel.** On appeal, the Petitioner argues that trial counsel was ineffective because he failed to call George Gates as a witness to rebut the victim's testimony at trial. The State responds that the post-conviction court properly denied relief because the Petitioner failed to establish that he received ineffective assistance of counsel. We agree with the State.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103. The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal quotation marks and citations omitted). "The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence." Id. (citing T.C.A. § 40-30-110(f); Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006)). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

Vaughn further repeated well-settled principles applicable to claims of ineffective assistance of counsel:

> The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States

Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases.

Vaughn, 202 S.W.3d at 116 (internal quotation marks and citations omitted).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Id. (citing Strickland v. Washington, 466 U.S. 668, 687 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697).

A petitioner successfully demonstrates deficient performance when the evidence establishes that the attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694).

We note that "[i]n evaluating an attorney's performance, a reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999) (citing Strickland, 466 U.S. at 689). Moreover, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Strickland, 466 U.S. at 688-89. "In reviewing counsel's conduct, we must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). However, this "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369).

The Petitioner argues that trial counsel was ineffective for failing to call George Gates as a witness to refute the victim's testimony. He contends that Mr. Gates would have impeached the credibility of the victim and called into question the victim's identification of the Petitioner as the perpetrator. The Petitioner maintains that trial counsel's failure is underscored by the disagreement between them and the "somewhat shaky defense proof[.]"

In its order denying relief, the post-conviction court found that "[t]he crux of Petitioner's testimony concern[ed] George Gates" and that the Petitioner believed that Mr. Gates "was the root of the problem." The court further found that the Petitioner believed "that Mr. Gates 'put him in this', even though the testimony at trial describe[d] the process by which Petitioner was first identified." The court also noted in its findings of fact that Mr. Gates could not be located at the time of trial or at the post-conviction hearing and that "[a]pparently, Mr. Gates still does not wish to participate in this matter." Accordingly, the post-conviction court concluded:

> In the case at hand, it is clear that trial counsel was thoroughly prepared for trial. The defense strategy was dictated by Petitioner's assertion that he was not present at the offense.
>
> The jury resolved this conflict in favor of the State. Petitioner has not presented any evidence that his trial attorney's performance was deficient.

We conclude that the Petitioner has failed to prove that trial counsel's performance was deficient. Trial counsel testified that he spent 135 hours working on the Petitioner's case and that he met with the Petitioner on twelve occasions. He stated that the defense at trial was that the Petitioner was not at the scene of the robbery and shooting. After Mr. Gates stated in his interview that he did not know anything about the case, trial counsel determined that Mr. Gates would not benefit the defense. However, trial counsel did present Vander Moore and the Petitioner's mother as alibi witnesses. This court must be highly deferential to counsel's performance, Burns, 6 S.W.3d at 462, and we will not second-guess the informed tactical and strategic decisions of trial counsel. Pylant v. State, 263 S.W.3d 854, 874 (Tenn. 2008) (citing Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997)). Here, the record reflects that trial counsel adequately prepared for trial and made informed strategic decisions. Although the Petitioner and trial counsel may have had disagreements, we note that a criminal defendant is not entitled to perfect representation, only constitutionally adequate representation. Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). Moreover, "'[t]he fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation.'" House, 44 S.W.3d at 515 (quoting Goad, 938 S.W.2d at 369). Based on the record, the Petitioner has failed to establish that trial counsel's conduct fell below "an objective standard of reasonableness under prevailing

-10-

professional norms." <u>Goad</u>, 938 S.W.2d at 369 (citing <u>Strickland</u>, 466 U.S. at 688; <u>Baxter</u>, 523 S.W.2d at 936). Accordingly, he is not entitled to relief on this issue.[2]

**II. Continuance.** The Petitioner also argues that the post-conviction court abused its discretion in refusing to continue the matter because "Mr. Gates was absolutely a critical witness[.]" In response, the State argues that the post-conviction court acted reasonably. We agree with the State.

The granting of a continuance lies within the sound discretion of the trial court, and this court will not reverse a decision regarding a continuance absent an abuse of discretion. <u>State v. Schmeiderer</u>, 319 S.W.3d 607, 617 (Tenn. 2010) (citing <u>State v. Odom</u>, 137 S.W.3d 572, 589 (Tenn. 2004)). "'An abuse of discretion is demonstrated by showing that the failure to grant a continuance denied defendant a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted.'" <u>Id.</u> (quoting <u>State v. Hines</u>, 919 S.W.2d 573, 579 (Tenn. 1995)). The party requesting the continuance has the burden of showing that the court's action was prejudicial. <u>State v. Goodman</u>, 643 S.W.2d 375, 378 (Tenn. Crim. App. 1982). "The only test is whether the defendant has been deprived of his rights and an injustice done." <u>Id.</u> Tennessee Supreme Court Rule 28, section 8(B) states that the evidentiary hearing on a petition for post-conviction relief "shall not be continued except by order of the court finding that unforeseeable circumstances render a continuance a manifest necessity. No continuance shall extend the hearing more than sixty (60) days beyond the original hearing date."

The record reflects that after trial counsel testified at the evidentiary hearing, post-conviction counsel asked the court to continue the hearing so that Mr. Gates could be located. The post-conviction court noted that counsel did not have an address for Mr. Gates and that previously, Mr. Gates could not be found at the time of the trial. The court further stated that the matter had been pending since October 2012 and that the court would have served the witness if it could. Post-conviction counsel advised the court that he had spoken with Mr. Gates numerous times and that although Mr. Gates did not provide counsel with an address, he had assured counsel that he would be present at the hearing. The post-conviction court

---

[2] Because the Petitioner has made an insufficient showing of deficiency, we need not address the issue of prejudice. <u>See</u> <u>Goad</u>, 938 S.W.2d at 370 (citing <u>Strickland</u>, 466 U.S. at 697). Nevertheless, we note that the Petitioner failed to present Mr. Gates as a witness at the post-conviction hearing. "'As a general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner.'" <u>Pylant</u>, 263 S.W.3d at 869 (quoting <u>Black v. State</u>, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990)). Moreover, the Petitioner has not demonstrated that he would have elicited favorable and material testimony from Mr. Gates regarding his defense. <u>See</u> <u>Denton</u>, 945 S.W.2d at 802-03 (citing <u>Black</u>, 794 S.W.2d at 757).

-11-

responded, "I'm pretty comfortable issuing process if I had a place to issue it. If I even had a place that I could send fugitive to look, I would send the deputies out to look for him." When counsel stated that the Petitioner had wished to testify after Mr. Gates, the court observed:

> Well here's the situation and I know you would prefer to unfold your case in the way that you want to, but sometimes -- I don't know where he is. I've got no idea about it and this is the hearing date that we've set and reset so I think that he probably -- because I'll tell you this. I think you need to conclude the proof that you have, and you had mentioned wanting to, I guess, submit your argument in written form. I'll give you a short amount of period to do that, and if Mr. Gates turns up then you can put him on. But I really can't keep this open for years on end when it appears that this person has been gone from the beginning. And I don't want to ever (indiscernible) what somebody else is going to do, but it appears to me and I'm finding Mr. Gates does not want to testify in these proceedings.
>
> He apparently made some statements and then and I don't know how to recount the term recanted, but he didn't say anything that the State wanted to put on and he didn't say anything that [trial counsel] wanted to put on so I think he was probably working real hard not to testify. And now you told him to be here and he says he'll be here and he's not, I don't know that things are going to change much, even though I appreciate that [the Petitioner] might wish him to be here.

At the conclusion of the hearing, the post-conviction court took the matter under advisement and noted that it would issue a written ruling on July 26, 2013, more than three weeks after the evidentiary hearing. The court further stated that it would hear the testimony of Mr. Gates if he appeared in the interim. The post-conviction court subsequently entered its written order denying relief on July 26, 2013.

Under these circumstances, we conclude that the post-conviction court did not abuse its discretion in refusing the continue the matter past July 26, 2013. Initially, we note that the court did not refuse to hear the testimony of Mr. Gates even though it had no good faith reason to believe that Mr. Gates would appear. However, as the post-conviction court observed, the case had been pending since October 2012, and the hearing had previously been reset on at least two occasions to locate Mr. Gates. The witness could not be found at the time of trial in 2010, and he did not appear at the post-conviction hearing three years later, despite his assurances to counsel. The record does not preponderate against the court's finding that Mr. Gates did not want to testify in the matter. In addition, the post-conviction

court did not have an address with which to serve Mr. Gates. Finally, the court stated that it would hear proof if the witness materialized within the twenty-four days after the hearing. Accordingly, the post-conviction court properly refused to further delay the matter.

## CONCLUSION

Discerning no error, we affirm the judgment of the post-conviction court.

_____
CAMILLE R. McMULLEN, JUDGE